UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>  v.<br><br>TOREZ RILEY,<br><br>Defendant. | 1:25-mj-00154 |

### ORDER

Torez Riley seeks the expungement of his arrest record in this case. For the reasons set forth herein, the Court GRANTS Riley's motion.

I.   BACKGROUND

On August 18, 2025, at approximately 8:30 p.m., Torez Riley walked into the Trader Joe's located at 350 Florida Avenue N.E., wearing a light gray hoodie, dark color jeans, and a black crossbody backpack. *See* Compl. ¶ 1-3, ECF No. 1. Riley is a Black man. *See id.* ¶ 2. Upon entering the grocery store, Riley was stopped and searched by over half a dozen armed federal and local officers from the Department of Homeland Security, Immigration Customs Enforcement, the Federal Bureau of Investigations, and the Metropolitan Police Department. *See* Resp. Opp. Gov.'s Suppl. Br. ("Resp. in Opp.") 1, ECF No. 10.

Officers stopped and searched Riley on the basis that they had allegedly seen him "look at their vehicle and grab the upper strap of his black satchel and pull the satchel slightly to the left and closer to his body, away from officers" before entering the grocery store. *See* Compl. ¶ 2.

1

Officers also noted that the backpack "appeared to be heavy as if a heavy object was weighing [it] down." *Id*. ¶ 3.

After officers recovered two firearms from the backpack, they arrested Riley for allegedly violating 18 U.S.C. § 922(g)(1) and D.C. Code § 4503(a)(1). Resp. in Opp. at 2. Authorities detained Riley on their own probable cause determination.

On August 20, 2025, the court authorized a criminal complaint and arrest warrant. *See* Compl. On August 21, 2025, Riley appeared before the court for his initial appearance. *See* Resp. in Opp. at 2. The nature of the charges allowed the government to obtain a pretrial detention hearing. *See* 18 U.S.C. § 3142. At the government's request, the court set a detention hearing for August 25, 2025. *See* Gov. Suppl. Br. Supp. Mot. Dismiss Compl. without Prejudice ("Gov. Supp. Br.") 2, ECF No. 9. In the intervening time, Riley was detained at the D.C. Jail.

"A spokesman for the Department of Justice said [U.S. Attorney] Pirro moved to dismiss the charges once she was shown body camera footage of the arrest on *Friday*." Carrie Johnson, *'The most illegal search': Judges push back against D.C. criminal charges*, NPR (Aug. 26, 2025), https://perma.cc/T9RV-E9JH (emphasis added). But it was not until *Monday*, August 25, 2025— about an hour and a half before the planned detention hearing—that the government filed a motion to dismiss the criminal complaint without prejudice. Gov. Mot. Dismiss Compl. without Prejudice 1, ECF No. 6.

On August 25, 2025, the Court held a hearing and granted the government's motion. Given the dismissal of the case, the Court ordered Riley's release forthwith. His release came after eight days of incarceration. During that time, he suffered greatly despite the fact that "Congress did not formulate the pretrial detention provisions as punishment." *United States v. Salerno*, 481 U.S. 739, 747 (1987). This was not unexpected "given the conditions at the D.C. jail." *United States v. Akers*,

2

No. 11-cr-313, 2025 WL 2611703, at *3 (D.D.C. Sept. 10, 2025) (citing *New Report on Jail Confirms Unsafe Conditions and Rising Deaths, Calls for Immediate Action*, Council for Court Excellence (May 28, 2025), https://perma.cc/4SPB-XD9U ("This audit offers the most comprehensive review to date of facility operations, documenting a crisis marked by rising deaths, structural decay, staff shortages, and inadequate medical and behavioral health care.")); Washington Post Editorial Board, *D.C.'s jail is a disgrace. Still.*, The Washington Post (June 4, 2025), https://perma.cc/LZ46-AUNQ ("The rate of death at the D.C. jail is three times the average of U.S. jails. For overdose deaths, the rate is 10 times the national average. The facility — especially its main building that opened in 1976 — is ridden with cockroaches, mice, and mold. In the span of just a year, an audit recorded almost 1,600 maintenance reports posing immediate health or safety risks. Most have to do with plumbing issues, which at times have resulted in "toilet water commingled with feces spewing onto residents and their living areas. Inmates are often subjected to extreme heat or cold due to poor climate-control systems.").

Pretrial incarceration also prevented Riley from being with his young sons—ages 3, 8, and 12—or helping his pregnant wife with household duties. *See* Resp. in Opp. at 2. Riley's wife was present at the August 25 hearing. She expressed that Riley's detention "put everything on [her]," as Riley missed several days of work at an auto repair shop and she missed school to care for their three children. Dave Jamieson, *Judge Warns Of 'Lawlessness' In Trump's DC Policing Takeover*, Huffington Post (Aug. 25, 2025), https://perma.cc/QLR9-MK5C; Carrie Johnson, *'The most illegal search': Judges push back against D.C. criminal charges*, NPR (Aug. 26, 2025), https://perma.cc/T9RV-E9JH.

Defendants have little in the way of remedies to address the harms of wrongful pretrial detention. One thing defendants can do seek is expungement, which Riley seeks here.

3

**II.     DISCUSSION**

"It is well established . . . that courts have the inherent, equitable power to expunge arrest records." *Livingston v. U.S. Dep't of Just.*, 759 F.2d 74, 78 (D.C. Cir. 1985).[1]

    A.     Jurisdiction

Magistrate judges derive their criminal jurisdiction from 28 U.S.C. § 636 and 18 U.S.C. § 3401. *See* § 636(A) ("[A] judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court"). One of the core statutory duties of a magistrate judge is determining whether to grant or deny an arrest warrant. *See* Fed. R. Crim. P. 4 (describing the procedures for obtaining an arrest warrant). These statutes and Rule do not speak to expungement. Still, the absence of explicit language does not preclude the jurisdiction to do so. *See United States v. Crane*, 979 F.2d 687, 690 (9th Cir. 1992) (holding that even though § 3401 did not explicitly authorize magistrate judges to revoke supervised release in misdemeanor cases, magistrate judges could do so where they had imposed the original sentence).

Specifically, 28 U.S.C. § 636(b)(3) provides that "[a] magistrate judge may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States." "Additional duties" has been interpreted liberally.[2] The Court has defined "additional duties" to

---

[1] "When sitting in equity, the court must 'mould each decree to the necessities of the particular case,' emphasize '[f]lexibility rather than rigidity,' and retain '[t]he qualities of mercy and practicality [that] have made equity the instrument for nice adjustment and reconciliation.'" *Livingston*, 759 F.2d at 78 (quoting *Flexibility Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

[2] In construing a magistrate judge's jurisdiction, courts have emphasized flexibility and efficiency. *See Peretz v. United States*, 501 U.S. 923, 932–33 (1991) (Absent "concerns about raising a constitutional issue or depriving a defendant of an important right, we should not foreclose constructive experiments [involving magistrate judges' jurisdiction] that are acceptable to all participants in the trial process and are consistent with the basic purposes of the statute."); *see also Gov't of Virgin Islands v. Williams*, 892 F.2d 305, 308 (3d Cir. 1989) ("Given the bloated dockets that district courts have now come to expect as ordinary, the role of the magistrate [judge] in today's federal judicial system is nothing less than indispensable.").

include only those duties that "bear some relation to the specified duties that the statute assigned to magistrate[ judges]." *See Peretz v. United States*, 501 U.S. 923, 930 (1991). Indeed, "[t]he generality of the category of 'additional duties' indicates that Congress intended to give federal [magistrate] judges significant leeway to experiment with possible improvements in the efficiency of the judicial process that had not already been tried or even foreseen." *Id.* at 932.

This construction of magistrate judges' jurisdiction, particularly as it relates to their role in adjudicating motions for expungement, finds support in *United States v. Vasquez*, 74 F. Supp. 2d 964, 967 (S.D. Cal. 1999). There, the court held that "[t]he authority of the magistrate judge to order expungement of a misdemeanor conviction record is [] implicit in the authority to enter the conviction *in the first place*." *Id.* (emphasis added). The principle underlying *Vasquez* is that judicial authority to act carries with it the corollary power to undo the act. That reasoning applies with equal force here. Because magistrate judges have the authority to issue an arrest warrant *in the first place*, they also have the authority to wipe that arrest warrant from the record. *See id.*; *United States v. Steelwright*, 179 F. Supp. 2d 567, 571 (D. Md. 2002) ("It is consistent with these statutes to confer jurisdiction to a magistrate judge to consider a request for expungement in a case where a magistrate judge initially presided over the defendant's case."). To hold otherwise would create an illogical gap in jurisdiction. *Cf. United States v. Pickard*, 733 F.3d 1297, 1300 (10th Cir. 2013) ("Once a court orders documents before it sealed, the court continues to have authority to enforce its order sealing those documents, as well as authority to loosen or eliminate any restrictions on the sealed documents," even if the case in which the documents were sealed has ended).

Riley seeks expungement. This expungement "bear[s] some relation to the specified duties that the statute assigned to [his] magistrate [judge]": issuing his arrest warrant in the first place.

5

*See Peretz*, 501 U.S. at 930. Thus, it falls within "additional duties." *Id.* (quoting § 636(b)(3)). Recognizing such authority is not a borderline question of jurisdiction like supervising voir dire in felony cases, *see id.* at 932–33 (finding that magistrate judges have this authority), or the authority to conduct the evidentiary and fact-finding portion of the sentencing hearing in a felony case. *See United States v. Ruiz-Rodriguez*, 277 F.3d 1281, 1285 (11th Cir. 2002) (finding that magistrate judges do not have this authority).

Further, characterizing expungement of an arrest warrant as an "additional duty" under § 636 is particularly appropriate here because Riley is not seeking expungement of a conviction, but merely the expungement of an arrest in a case where the government dismissed the charges. "[T]here is a large difference between expunging the arrest record of a presumably innocent person, and expunging the conviction of a person adjudged as guilty in a court of law." *United States v. Pinto*, 1 F.3d 1069, 1070 (10th Cir. 1993).

B. <u>Extraordinary Circumstances</u>

1. Standard for expungement

"[T]he decision to expunge an arrest record depends on the facts and circumstances of the case," and "there must be a logical relationship between the injury and the requested remedy." *Doe v. Webster*, 606 F.2d 1226, 1230 (D.C. Cir. 1979). A case involving "a lack of probable cause coupled with special circumstances, flagrant violations of the Constitution, or other unusual and extraordinary circumstances," warrants expungement. *Id.* The "expungement of an arrest record is appropriate when serious governmental misbehavior leading to the arrest, or unusually substantial harm to the defendant not in any way attributable to him, outweighs the government's need for a record of the arrest." *Id.* at 1231.

Extraordinary circumstances is "a nebulous concept." *United States v. McKnight*, 33 F. Supp. 3d 577, 584 (D. Md. 2014). However, courts have found that such "circumstances most clearly exist in cases where the underlying arrest or conviction was unlawful and/or unconstitutional, government misconduct is alleged, or the statute on which the arrest was based is subsequently found unconstitutional." *Id.* Other courts have found extraordinary circumstances where a "[d]efendant has, for example, been denied a security clearance, specific job opportunities, or has otherwise been materially harmed by the presence of criminal records." *Id.* "Extraordinary circumstances may [also] include politically or racially motivated arrests." *United States v. Woods*, 313 F. Supp. 3d 197, 199 (D.D.C. 2018).

2. The unconstitutional search of Riley

This was an illegal search.

Before the first opportunity to have its case pressure tested, the government folded. The U.S. Attorney admitted to "mov[ing] to dismiss the charges once she was shown body camera footage of the arrest on Friday." Carrie Johnson, *'The most illegal search': Judges push back against D.C. criminal charges*, NPR (Aug. 26, 2025), https://perma.cc/T9RV-E9JH. The government's dismissal request is the clearest evidence that the government recognized that this was an illegal search. And the caselaw supports their conclusion.

One factor courts consider is where the search occurred. *See United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001) ("[T]he fact that a given locale is well known for criminal activity will not by *itself* justify a *Terry* stop; but it is among the various factors that officers may take into account."). Here, Riley was in the Union Market neighborhood, a haven for the privileged. This is hardly a high crime neighborhood. Riley was grocery shopping at Trader Joe's, not loitering at an open-air drug market.

Another factor courts consider is a defendant's appearance. *See Florida v. Royer*, 460 U.S. 491, 502 (1983) (taking into account defendant's appearance, mannerisms, and luggage in reasonable suspicion analysis). Riley was wearing a backpack. Officers found that suspicious because it looked as if something heavy was inside of it. *See* Compl. ¶ 3. Isn't that the point of backpacks: to carry heavy things, like laptops, books, etc.? The body worn camera from the officer shows how mundane the backpack appears:



The only other explanation officers gave for why the backpack might contain contraband was their undocumented claim that Riley performed a "security check" when he saw officers. *See id*. That is, Riley "grab[bed] the upper strap of his black satchel and pull[ed] the satchel slightly to the left and closer to his body, away from officers [who were in their vehicle at the time]." Gov. Supp. Br. at 9. Adjusting a backpack is neither a crime, nor does it give rise to reasonable suspicion of one. Elementary-school experience and the caselaw support that.

Indeed, Riley's "slight[]" adjustment of his backpack factually pales in comparison to cases where there was reasonable suspicion. In *United States v. Williams*, 507 F. Supp. 3d 181, 198 (D.D.C. 2020), the court found reasonable suspicion where police observed an individual receive and hide a backpack after a cash exchange. There was no such concealment here, let alone an exchange. In *United States v. Taylor*, 743 F. Supp. 3d 168, 171–78 (D.D.C. 2024), after officers observed an L shaped object "popping out [] from the satchel," the defendant "conceal[ed] the satchel from the officers' view," by switching the satchel from the

8

right side of his body to the left, "so that it was facing away from the street and away from the officers." Riley's backpack had nothing protruding from it, nor did he make movements to conceal it.

An analogous case is *United States v. Shelton*, No. 02-cr-75, 2002 WL 1792087, at *7 (D. Neb. Aug. 5, 2002). There, officers were at a bus station, looking for activity consistent with the transportation of narcotics. *Id.* at *1. A bus arrived at the station for refueling and cleaning. *Id.* Shelton came off the bus carrying a duffle bag that appeared to be heavy because "it sagged in the middle; it appeared to contain a weight." *Id.* An officer observed Shelton place the duffle bag on a table near the snack bar and began "scanning" the area. *Id.* While at the table, Shelton did not "open the bag, retrieve anything from it, or open the bag's exterior pockets," which caught the officer's attention. *Id.* at *2. The officer then stopped and searched Shelton. *Id.* The search revealed drugs. *Id.* at *4. The court found that "merely because one sits quietly in a bus terminal canteen with one's bottom-heavy bag on a table, watching the world go by, does not create a reasonable suspicion that one is engaged in criminal activity." *Id.* at *7. Similarly, Riley's actions were those that "describe the behavior of significant numbers of innocent persons." *United States v. Sokolow*, 490 U.S. 1, 2 (1989). That is not enough for reasonable suspicion. *See id.*

The final fact to consider is that Riley is Black. This fact carries consequences. "[A]nalysis of 2022-2023 stop-and-frisk data collected by the D.C. Metropolitan Police Department (MPD) revealed that Black people compose 70% of people stopped in the District, despite making up 44% of the D.C. population." *Bias at the Core? Enduring Racial Disparities in D.C. Metropolitan Police Department Stop-and-Frisk Practices*, ACLU (2024), https://perma.cc/U7TB-BR7B.

C.    <u>Injury</u>

After establishing exceptional circumstances, the defendant must next identify a "cognizable legal injury." *Menard v. Saxbe*, 498 F.2d 1017, 1023 (D.C. Cir. 1974). However, expungement does not require him to demonstrate "with mathematical certainty . . . the exact consequences of his criminal file." *Menard*, 498 F.2d at 1023.

The injury to Riley is multi-faceted. First, the government took eight days of Riley's life from him. As detailed above, those eight days at the D.C. jail likely caused severe trauma. *See Akers*, 2025 WL 2611703, at *3. Second, the collateral consequences and lasting mark of an arrest will haunt Riley for the rest of his life. *See infra*. Third, it is difficult not to recognize how pretextual stops like this cause Riley, and his sons in turn, to be fearful of law enforcement, which is a harm to everyone's public safety. *See* U.S. Dep't of Just., *Importance of Police-Community Relationships and Resources for Further Reading* 1 (2015), https://perma.cc/YWV8-68SC ("Strong relationships of mutual trust between police agencies and the communities they serve are critical to maintaining public safety and effective policing."). The Court cannot remedy the first or third injuries. But there is a "logical relationship between the [second] injury and [expungement]." *See Webster*, 606 F.2d at 1230.

The collateral consequences that flow from an arrest are innumerable. An arrest causes harmful legal consequences, social stigma, and economic hardship. As to legal consequences, "'[i]t is common knowledge that a man with an arrest record is much more apt to be subject to police scrutiny—the first to be questioned and the last eliminated as a suspect to an investigation.' Existence of a record may burden a decision whether to testify at trial. And records of arrest are used by judges in making decisions as to sentencing, whether to grant bail, or whether to release

pending appeal." *Saxbe*, 498 F.2d at 1024 (quoting *Davidson v. Dill*, 503 P.2d 157, 159 (Colo. 1972)).

As to social stigma, "[e]ven if no direct economic loss is involved, the injury to an individual's reputation may be substantial." *Natwig v. Webster*, 562 F. Supp. 225, 229 (D.R.I. 1983) (quoting *Menard v. Mitchell*, 430 F.2d 486, 490–91 (D.C. Cir. 1970)) (plaintiff seeking injunction requiring Director of FBI to expunge records relating to his prior arrests). And "[e]conomic losses themselves may be both direct and serious. Opportunities for schooling, employment or professional licenses may be restricted or nonexistent as a consequence of the mere fact of an arrest." *Id.*[3] "It is sufficient to say here that an arrest record alone can create serious adverse consequences for those who have been arrested in the past, notwithstanding the ultimate disposition of the case." *United States v. Schnitzer*, 567 F.2d 536, 539 (2d Cir. 1977) (Appellant seeking expungement of record after dismissal of indictment).

These social and economic injuries alone may be insufficient to justify expungement. *See United States v. Evans*, 78 F. Supp. 3d 351, 353 (D.D.C. 2015). But when combined with the exceptional circumstance "of police action in violation of constitutional rights," expungement is justified. *Sullivan v. Murphy*, 478 F.2d 938, 968 (D.C. Cir. 1973).

D.    Balancing Test

The government has a legitimate need to maintain records of arrests. *See Webster*, 606 F.2d at 1241. Its interest is twofold: "(1) the need to preserve an accurate record of that which has in fact occurred, I. e., [sic] not to 'rewrite history;' and (2) the need to retain such a record for investigative and other law enforcement purposes." *Id.* But this interest is not unlimited. It

---

[3] "Employment rejections due to a criminal record not only have detrimental effects on the individuals involved, but have detrimental effects on society. Lack of employment has been correlated to increased recidivism." *McKnight*, 33 F. Supp. 3d at 586.

11

"requires a balancing of the equities between the right of privacy of the individual and the right of law enforcement officers to perform their necessary duties." *In re Reid*, 569 F. Supp. 2d 220, 222 (D.D.C. 2008).

Records of arrests are less meaningful than records of a conviction. *See Pinto*, 1 F.3d at 1070. "The mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense." *Schware v. Bd. of Bar Exam. of N.M.*, 353 U.S. 232, 241 (1957).

There is no value in retaining Riley's arrest record because the arrest should not have happened in the first place. *See United States v. Benlizar*, 459 F. Supp. 614, 624 (D.D.C. 1978) ("[A]n arrest can be expunged when illegal government behavior taints the validity of the arrest."). Indeed, this court has previously discounted the value of arrest records generated by Fourth Amendment violations. *See Gomez v. Wilson*, 323 F. Supp. 87, 92–93 (D.D.C. 1971) (expunging police records where law enforcement violated the Fourth Amendment by twice stopping plaintiff without articulable suspicion of illegal activity and questioning him inappropriately). "It would be anomalous indeed, if a valid [arrest] would be expungable, whereas an unconstitutional [arrest] would endure to haunt the defendant." *Benlizar*, 459 F. Supp. at 624 (expungement appropriate where defendant's conviction was overturned after it became apparent that the government destroyed evidence and misled the court). "[I]n the case at bar any legitimate public interest in these records is severely undermined by the fact that they are the product of an arrest procedure that was not rooted in [proper] probable cause determinations." *Sullivan v. Murphy*, 478 F.2d 938, 970 (D.C. Cir. 1973) (expungement of arrest records appropriate where there was no showing of probable cause due to suspension of established field arrest form procedures).

What the government did to Riley did not occur in a vacuum.

> For the last several weeks, judges in this District have seen case after case involving unprecedented prosecutorial action. In some cases, prosecutors have elected to pursue charges even after federal grand juries have refused to return an indictment. *See, e.g.*, Order at 1, *United States v. Stewart*, No. 25-mj-225, ECF No. 12 (D.D.C. Sept. 29, 2025); *United States v. Jones*, No. 25-mj-148 (D.D.C.); *United States v. Dunn*, No. 25-cr-252 (D.D.C.); *United States v. Wilson*, No. 25-mj-190 (D.D.C.); *United States v. Bryant*, No. 25-mj-173 (D.D.C.). In others, the Government has been charging cases notwithstanding apparent constitutional violations. *See, e.g.*, Order at 1 n.1, *Stewart*, No. 25-mj-225, ECF No. 12 (citing *United States v. Torez Riley*, No. 25-mj-154 (D.D.C.); and then citing *United States v. Thompson*, No. 25-cr-71 (D.D.C.)). Most troubling, prosecutors have rushed to charge cases before properly investigating them, resulting in individuals being detained for days only to have the Government voluntarily dismiss the charges against them at early hearings. *See, e.g., United States v. Pichon* No. 25-mj-167 (D.D.C.); *United States v. Nguyen*, No. 25-mj-170 (D.D.C.); *see also* Order at 2, *United States v. Dana*, No. 25-mj-152, ECF No. 16 (D.D.C. Sept. 4, 2025) (noting "an unprecedented number of cases that the U.S. Attorney dismissed in the past ten days, all of whom were detained for some period of time"). Prosecutors have also seemingly disregarded the requirement in Rule 5 of the Federal Rules of Criminal Procedure that the Government bring a defendant before a Magistrate Judge without unnecessary delay. As a result, individuals have been detained for days despite the Government having no reason to detain them and in fact not seeking to detain them when it finally brought them to court. *See, e.g., United States v. Cooper*, No. 25- mj-163-2, 2025 WL 2496013, at *1 (D.D.C. Aug. 27, 2025); *United States v. Rios-Esquivel*, No. 25-mj-162, 2025 WL 2451152, at *1 (D.D.C. Aug. 26, 2025). And just this week, prosecutors attempted to return a grand jury indictment from the Superior Court of the District of Columbia in this court after a federal grand jury refused to return an indictment. See Order at 1–2, *Stewart*, No. 25-mj-225, ECF No. 12.

*United States v. Beidleman*, No. 25-cr-270, 2025 WL 2803850, at *1 (D.D.C. Oct. 1, 2025). As with several recent cases, it appears prosecutors charged and detained Riley before properly investigating the circumstances of his arrest. This further corroborates Judge Sooknanan's concern that "prosecutors have rushed to charge cases before properly investigating them, resulting in individuals being detained for days only to have the Government voluntarily dismiss the charges against them at early hearings." *Id.* at *1. Arresting and jailing someone requires careful forethought, not belated afterthought. Perhaps this rush to charge regardless of the legality of the arrest helps explain the "unprecedented" rate at which the government has recently dismissed cases. *United States v. Butler*, No. 25-cr-0256, 2025 WL 2835678, at *1 (D.D.C. Oct. 3, 2025). Specifically, the government has moved to dismiss 21% of all cases that have been charged by criminal complaint over the last eight weeks. *Id.* This is a shocking statistic compared to the 0.5% of cases charged by criminal complaint that the government has dismissed over the last *ten years*. *Id.*

For the government to now double down and argue that it is entitled to preserve a record it never should have had adds insult to injury. The community has no need for the government to retain a record of its unlawful action.

E.  <u>But why does this matter if Riley had contraband</u>

The Framers were acutely concerned with limiting the government's ability to search private spaces. *See Payton v. New York*, 445 U.S. 573, 596 (1980) ("[C]ommon-law sources [on warrants] display a sensitivity to privacy interests that could not have been lost on the Framers."); *Oliver v. United States*, 466 U.S. 170, 178 (1984) ("The [Fourth] Amendment reflects the recognition of the Framers that certain enclaves should be free from arbitrary government interference."). That is why they drafted the Fourth Amendment to protect all people—the innocent

14

and the guilty—from unreasonable searches and seizures. *See United States v. Chadwick*, 433 U.S. 1, 9 (1977) ("What we do know is that the Framers were men who focused on the wrongs of that day but who intended the Fourth Amendment to safeguard fundamental values which would far outlast the specific abuses which gave it birth."). And that is why there is no exception to the Fourth Amendment for illegal searches that yield contraband.

Courts only see the cases where the illegal search yields contraband. But consider what the courts do not see: the illegal searches where officers find no contraband. Those people likely have no remedy for the harassment they suffered. The only way to deter illegal searches is to hold the government accountable when such searches come before the court regardless of the fruits of the search. *See Elkins v. United States*, 364 U.S. 206, 217 (1960) (holding that the exclusionary "rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."). That is the case, even if the "criminal goes free," because "it is the law that sets him free." *See Mapp v. Ohio*, 367 U.S. 643, 657–59 (1961) (holding that the exclusionary rule is an "essential part" of the Fourth Amendment). Courts hold the government accountable because the alternative is far worse: "Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." *Id.* at 659.

### III.  CONCLUSION

Acting on impulse in the frozen food aisle at Trader Joe's: reasonable.

Acting on impulse to illegally search people: unreasonable.

---
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE